# IN THE COURT OF APPEALS OF IOWA

No. 23-1801
Filed August 21, 2024

**MARYANN IDA CUTSHALL,**
 Plaintiff-Appellee,

**vs.**

**GAGE JOSEPH OLSON,**
 Defendant-Appellant.
_____

Appeal from the Iowa District Court for Butler County, Gregg R. Rosenbladt,
Judge.

A father appeals a district court ruling placing the parties' children in the
mother's physical care. **AFFIRMED.**

Elizabeth M. Wayne, Parkersburg, for appellant.

John J. Wood of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C.,
Waterloo, for appellee.

Considered by Badding, P.J., Langholz, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2024).

**BADDING, Presiding Judge.**

In its ruling placing the parties' two minor children in the physical care of their mother, Maryann Cutshall, the district court noted: "This is a case where the Court has very much considered granting shared physical care of the children." But three concerns tipped the scales for the court: (1) an incident where the father, Gage Olson, spanked the oldest child and left a bruise; (2) marijuana and drug paraphernalia found in Gage's home; and (3) Gage's less-structured approach to parenting. Gage appeals, claiming those concerns should not have outweighed all the other factors that favored his request for joint physical care. Giving "careful consideration to the district court's findings" in this close case, we affirm upon our de novo review of the record. *See In re Marriage of Reed*, No. 09-0029, 2009 WL 4122884, at *6 (Iowa Ct. App. Nov. 25, 2009).

Gage and Maryann are the parents of two young children—I.O., born in 2018, and D.O., born in 2020. They dated for five years but never married. Soon after D.O.'s first birthday, Gage and Maryann ended their relationship. They alternated weeks with the children without court involvement. But in September 2022, Maryann became concerned about the children's safety in Gage's care and petitioned to establish custody, visitation, and child support.

Maryann's petition was prompted by two encounters with the Iowa Department of Health and Human Services. In February, Gage told Maryann that the parties' oldest child was not listening to him and being naughty. He got frustrated and spanked her too hard, leaving a bruise on I.O.'s bottom. The child's daycare provider contacted the department. Gage told the department's child protective worker investigating the report that he felt terrible about what happened

and was not going to use physical discipline anymore.  The report was confirmed but not placed on the child abuse registry.

The department investigated another report at the beginning of September—this time about an allegation that Gage was using and selling marijuana.  Gage denied the allegation.  But a few days after the child protective worker's visit, the police executed a search warrant at Gage's home.  He was arrested and charged with possession of marijuana.[1]  The police told the department's worker that they found several items in the garage with marijuana residue, along with a vape pen used for smoking marijuana and "a 'blunt' style cigarette containing a leafy substance that tested positive for marijuana."  They also had a picture of "a large box of marijuana items" that Gage admitted had been in his garage—although the box was not found during the search.  The police told the worker that Gage admitted on video that he was selling those drug items for extra income.

This time, the department's report was founded, and Gage voluntarily participated in services.  He submitted to random drug tests, all of which were negative.  Gage also obtained a substance-use evaluation that did not recommend any treatment.  And he participated in a SafeCare program, which he explained "helped him a lot" and taught him ways to "teach your kids, guide your kids, how to parent your kids."

Yet in January 2023, Gage grabbed the parties' youngest child, D.O., by the shirt because the child was not listening to him.  D.O. jerked away from Gage and

---

[1] Gage later pled guilty to this charge and received a deferred judgment.

hit the floor, leaving him with a fat lip.[2]  After that, Maryann asked the district court to temporarily place the children in her physical care, while Gage sought to continue their informal joint-physical-care arrangement.  Following a hearing in April, the court entered a temporary order placing the children in Maryann's physical care with visitation for Gage every other weekend and each Wednesday evening.

Maryann sought to continue that arrangement at the trial in August.  She testified that since the temporary order, the children had settled into a good routine:

> [S]ame time for bed, same time waking up in the morning.  We don't argue about waking up.  We don't argue about going to bed.  They just know it's time.
> Even with [Gage] having them Wednesday, they still go to bed at 8:30, keep the routine.  It's going well.  They don't argue with me as much about going to their dad's anymore.  They seem a little more excited to see him.

She felt the shorter, but more frequent, times with the children in Gage's care were better.  When they had been alternating weeks with the children, Maryann testified that Gage told her he felt overwhelmed.

But Gage testified that Maryann told him the same thing, recalling several times when she called him "crying that she couldn't handle it."  Gage was also concerned about Maryann's mental health.  In October 2022, she was involuntarily committed after a suicide attempt.  The children were not with her when this happened.  Maryann explained that she had not been taking her medication for her bipolar disorder.  She was released after three days in the hospital and now receives her medication by injection each month.  She has regular appointments

---

[2] Gage said this happened before he completed the SafeCare program.

with a physician to manage her medication and sees a therapist weekly. Maryann described her mental health at trial as "[v]ery good" and stable.

Despite these events, each party described the other as a good parent. They communicate well, with little conflict, and live within ten or fifteen minutes of one another. Maryann owns a four-bedroom home on an acreage, while Gage has a three-bedroom home in town. They use the same daycare for the children, and they agree about where the children should attend school. While Maryann schedules most of the children's appointments, she keeps Gage informed about them and they attend some together.

In its custody ruling, the district court noted these positive factors supporting Gage's request for joint physical care of the children. But, finding Maryann to be "very credible," the court highlighted "several concerns which point away from shared physical care":

> [Maryann] comes across as being very organized and routined. She seems to place the interests of the children in a primary position. She has regular work hours more conducive to dropping off the children in the morning. She has made arrangements to enroll the older child in preschool. While she has had some mental health challenges in the past, it appears that she is very stable now and is involved with medication and ongoing therapy. [Maryann] seems to have a very even and patient approach to parenting and is quite willing to work with and coparent with [Gage]. Importantly, there are no concerns with abuse of the children or with substance abuse on her part. The Court, after observing her testimony, concluded that she was very invested in the children and interested in having a routine for them and was very conscientious about covering their financial needs and appointments and school needs.

While the court found Gage was also a good parent, it was concerned by the injuries the children received in his care and the marijuana in his home: "[Gage] was generally credible, but his explanation of the drugs and paraphernalia found

in his home and his interactions with the police regarding the same were not especially credible, and he seemed to be minimizing the incident somewhat."

Unlike Maryann's testimony about her mental health, Gage's testimony about the marijuana and drug paraphernalia was cagey. He first testified that "[a]ll the police found was an empty container and a half-smoked joint. That's all they found, and I got arrested." But then he acknowledged they also found "some glass containers that contained large marijuana cigarettes" in his garage, which he told law enforcement that he "must have forgotten about." When asked whether he tried to hide the marijuana and drug paraphernalia in his garage, Gage responded:

It wasn't in my house. No, it wasn't.
Q. It wasn't your house? A. No.
Q. Whose house was it? A. It wasn't anyone's house. It doesn't concern you.
Q. I'm sorry? A. It got thrown away. I got rid of it.
Q. Got rid of what? A. Whatever I had.
Q. What did you have? A. The marijuana they found.

And when pressed, "Why did you admit to law enforcement that you were selling drug items?" Gage answered:

Because I wasn't.
Q. But it says that you admitted to it. A. Okay.
Q. What—what did you say to law enforcement? A. I told them I didn't—I didn't have it.
Q. No. A. They didn't find anything. They found what they found, and I went to jail. That was the end of that.

Along with its concerns about this testimony, the court found that compared to Maryann, Gage was "less structured and organized in his approach to parenting." The court noted that several of Gage's witnesses "emphasized that he liked to 'hang out' a lot," suggesting to the court that he was not as focused on parenting as Maryann was. While the court found both parties were "good and

appropriate young parents overall," after considering "the children's best interest and the stability and parenting of the parties," the court determined the children should continue in Maryann's physical care with visitation for Gage. We agree.

Though our review of child custody rulings is de novo, we give weight to the district court's factual findings, especially when considering the credibility of witnesses. *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. May 26, 2010). This is because the court, as a "first-hand observer of witnesses, holds a distinct advantage over an appellate court, which necessarily must rely on a cold transcript." *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989); *accord McKee*, 785 N.W.2d at 736 (recognizing the "district court was able to listen to and observe the parties and witnesses"). While we are not bound by the court's findings, in this type of close case, "we are particularly sensitive to the limitations of the written page." *Nelson v. Wieling*, No. 04-0135, 2004 WL 2002677, at *1 (Iowa Ct. App. Sept. 9, 2004).

Still, Gage argues that many of the factors we consider in evaluating whether joint physical care is appropriate weigh in his favor. *See In re Marriage of Hansen*, 733 N.W.2d 683, 697–99 (Iowa 2007) (discussing those factors); *see also Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988) (stating that for both married and unmarried parents, we are guided by the factors set out in Iowa Code section 598.41(3) (2022) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)); *see also* Iowa Code § 600B.40(2) (providing that the factors contained in Iowa Code section 598.41(3) also apply to chapter 600B actions). But, as Maryann asserts, these factors are not always determinative. Instead, we "must consider the total setting presented by each unique case." *Hansen*, 733

N.W.2d at 699. The factors outlined in *Hansen* "present important considerations, but no iron clad formula or inflexible system of legal presumptions." *Id.* at 700. The overriding consideration is the best interests of the children, *McKee*, 785 N.W.2d at 736, and our goal is to place them "in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

Deferring to the district court's credibility findings, we find that environment is with Maryann for the same reasons discussed by the district court. *See In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996) ("[I]n the end we determine this to be a close case, for both parents love their children very much and each is capable of providing for their long-range best interests. In situations such as this, we note the district court had the parties before it and was able to observe and evaluate the parties as custodians."). This does not, however, diminish Gage's important role in the children's lives or his love and devotion to them. *See Hansen*, 733 N.W.2d at 705 ("[T]he quality, and not the quantity, of contacts with the non-custodial parent are the key to the wellbeing of [the] children."). We affirm the district court's decision placing the children in Maryann's physical care and encourage the parties to continue their positive co-parenting relationship.

Although Maryann was successful on appeal, we deny her request for an award of appellate attorney fees after considering her higher income and Gage's ability to pay. *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005).

**AFFIRMED.**